FILED IN CHAMBERS
U.S.D.C. Atlanta

MAY 16 2006

LUTHER D. THOMAS, Clerk
By: _____
Deputy Clerk

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

3Q TECHNOLOGIES, LTD.,
and 3DMD, LLC,

      Plaintiffs,

    v.

CANFIELD SCIENTIFIC, INC.,
SURFIM LIMITED; and
SURFACE IMAGING
INTERNATIONAL LIMITED,

      Defendants.

CIVIL ACTION

NO. 1:05-CV-2454-RLV

O R D E R

    This is an action for copyright infringement in violation of 17 U.S.C. § 501, federal unfair competition in violation of 15 U.S.C. § 1125(a), and unfair competition under Georgia state law. This matter is before the court on Surfim Limited's ("Surfim") motion to dismiss for lack of personal jurisdiction and improper venue [Doc. No. 13]; Surface Imaging International Limited's ("SIIL") motion to dismiss for insufficiency of service of process [Doc. No. 14];[1] SIIL's motion to dismiss for lack of personal jurisdiction and improper venue [Doc. No. 27]; and SIIL and

--------

[1]On December 5, 2005, SIIL filed a motion for insufficiency of service of process [Doc. No. 14]. This motion is moot because SIIL has not renewed its motion to dismiss on these grounds after the plaintiffs filed their Second Amended Complaint on March 6, 2006 [Doc. No. 41]. Therefore, the court limits its examination to Surfim and SIIL's motions to dismiss for lack of personal jurisdiction and improper venue [Doc. Nos. 13, 27, 47, and 48].

Surfim's renewed motions to dismiss them as parties for lack of personal jurisdiction and improper venue [Doc. Nos. 47 and 48].

## II. Factual Background and Procedural History

The following facts are gleaned from the court's review of the record and the parties' submissions.[2]   The plaintiffs, 3Q Technologies, Ltd. ("3QT") and 3dMD, LLC, ("3dMD"), filed the current suit on September 21, 2005; the complaint was subsequently amended on October 17, 2005, and most recently on March 6, 2006. The plaintiffs sued Canfield Scientific, Inc. ("Canfield"),[3] Surfim, and SIIL alleging (1) copyright infringement in violation of 17 U.S.C. § 501; (2) unfair competition in violation of 15 U.S.C. § 1125(a); and unfair competition in violation of Georgia state law.

As set forth in the Second Amended Complaint, 3QT is a limited liability partnership incorporated in the United Kingdom, which maintains an office and place of business in Atlanta, Georgia. 3dMD is a wholly owned subsidiary of 3QT, incorporated in Delaware with its principal place of business in Atlanta, Georgia. Canfield is a corporation organized under the laws of the State of New

---

[2] To the extent that conflicting inferences can be drawn from the jurisdictional allegations asserted by both sides, the court construes all reasonable inferences for the plaintiffs in detailing the relevant facts. Robinson v. Giarmarco & Bill, P.C., 74 F.3d 253, 255 (11th Cir. 1996).

[3] Canfield has answered the plaintiffs' complaint and has asserted a counterclaim.

Jersey and with its principal place of business in New Jersey. Both Surfim and SIIL are incorporated under the laws of the United Kingdom and have registered offices and places of businesses in the United Kingdom.

On January 17, 2002, 3QT purchased all of the assets, including all intellectual property, TCT International plc ("TCTI"). Before the sale to 3QT, TCTI and its predecessor in interest, Tricolor plc ("Tricolor"), and associated companies, allegedly spent years and over £10 million developing software related to 3-dimensional ("3-D") photography and computer modeling of people. Through the asset purchases, 3QT obtained all of TCTI's 3-D imaging software and application software as well as its client base, sales prospects, and all existing employment agreements. Some of the employees from TCTI who began working for 3QT included Dr. Gerhart Paul Otto, Dr. Laura Daye Dekker, and Mr. Athula Mandanayake. Otto, Dekker, and Mandanayake were employed to further modify and develop the software that had been obtained from TCTI and to develop new software relating to 3-D imaging and applications.

On April 28, 2002, a contact consultant, Nicholas Miedzianoski-Sinclair, approached the principals of 3QT, Christopher R. Lane, and Kelly Duncan, for permission to approach his personal contacts to see if his personal contacts were interested in purchasing 3QT's wholly-owned subsidiary 3dMD. On

3

July 5, 2002, Lane informed Sinclair to end the attempt to sell 3dMD.  Rather than sell 3dMD, Sinclair was directed to focus his efforts on generating sales of 3dMD products.

During the summer and fall of 2002, Otto, Dekker, Mandanayake, and Sinclair "conducted several clandestine meetings to discuss forming and obtaining financing for a new company ("Newco") that would utilize" 3QT's intellectual property and compete directly with 3QT.  It is alleged that these individuals met with Dr. Keith Monserrat and others at SIGMA Technology Group Ltd ("SIGMA").  On September 24, 2002, 3D4 Medicine Limited ("3D4") was formed, naming Otto, Dekker,[4] Mandanayake, and Sinclair and an investment consultant, Adrian Goodall, as directors.  In addition to meeting with members of Newco and 3D4 during the fall of 2002, SIGMA conducted meetings with Lane and Duncan regarding potentially purchasing 3QT and/or 3dMD.  When SIGMA's attempt to purchase 3dMD and/or 3QT failed in late 2002, Otto and Mandanayake resigned as employees of 3QT, and Dekker resigned as a contractor.[5]  All of the

---

[4] In August 2002, Dekker resigned as an employee of 3QT but continued to work for the company as a contractor.  It is alleged that Dekker forwarded a confidential business plan to Monserrat.

[5] In early 2003, Otto and Mandanayake requested to leave their employment 30 days before their notice period concluded.  The principals of 3QT agreed on the condition that each sign a deed that reconfirmed certain clauses of their existing employment contacts.  In doing so, each confirmed the continuing effect of certain clauses of their respective employment agreements.  In early March 2003, Otto and Mandanayake each signed a "Deed of Confirmation," which stated that they would not improperly use 3QT's confidential information.

above activities and events occurred in the United Kingdom.

On March 6, 2003, Surfim was formed in the United Kingdom with Otto and Mandanayake listed as directors. On April 7, 2003, Medeim Limited ("Medeim") was formed in the United Kingdom with Sinclair listed as a director. Medeim later changed its name to SIIL.

While the Second Amended Complaint contains several Counts, the court limits its inquiry to the plaintiffs' allegations focusing on an alleged copyright infringement that occurred in Atlanta, Georgia.

In ¶ 17 of the Second Amended Complaint, the plaintiffs allege:

> [I]mmediately after leaving 3Q Technologies, at least Otto, Mandanayake and Sinclair cooperated to form Surfim and Medeim with the intent of creating competing technology based upon software and technology obtained from 3Q Technologies. On information and belief, within 3 months after they were formed, Surfim and/or Medeim delivered a fully operational system that was virtually identical to the 3Q Technologies system to at least one 3Q Technologies customer.

In ¶¶ 18 and 19, the plaintiffs further allege:

> 18. On information and belief, Otto, Mandanayake and Sinclair continued to develop derivative works for Surfim and/or Medeim or SII that are based on 3Q Technologies' Copyrighted Works. A derivative work of 3Q Technologies' intellectual property and Copyrighted Works dated April 2, 2003 that was on information and belief, created by Surfim and/or Medeim was obtained as a result of the formal settlement with Goodall. From 2003 until 2005, however, Surfim and Medeim's or SII's commercial activities have been, on information and belief, somewhat limited.

> 19. On information and belief, in late 2004 or 2005, Surfim and/or Medeim or SII and their principals sold,

5

licensed and/or transferred technology and information, including computer software consisting of derivative works based on 3Q Technologies' Copyrighted Works, to Defendant Canfield.  Canfield has, on information and belief, commercialized a 3-dimensional imaging and analysis system called the "Vecta 3D Imaging System" that competes directly with 3dMD's proprietary system and is assertedly based on the same technology as the 3dMD imaging system.  On information and belief, Defendants' actions constitute willful and wanton copyright infringement of Plaintiff's Copyrighted Works.

On December 5, 2005, and January 17, 2006, Surfim and SIIL filed motions to dismiss, arguing that this court lacks personal jurisdiction over either defendant and that this court is not the proper venue for the resolution of this suit [Doc. Nos. 13 and 27].[6]  In their response, the plaintiffs argue that this court has personal jurisdiction over Surfim and SIIL and that this court is the proper venue for the resolution of this suit based upon the placement of a single 3-D imaging system placed at Paces Plastic Surgery and Recovery Center ("Paces Plastic") in Atlanta, Geogia.[7]

[6] On April 13, 2006, Surfim and SIIL renewed their motions to dismiss for lack of personal jurisdiction and improper venue [Doc. Nos. 47 and 48] after the plaintiffs had filed a Second Amended Complaint on March 6, 2006.

[7] According to the affidavit of T. Roderick Hester, M.D., who is the founder of Paces Plastic in Atlanta, Georgia:

3. Approximately during Fall of 2004, I was approached by Mr. Sinclair and Mr. Read regarding a 3d imaging camera. They inquired into the possibility of installing this camera in my offices and having my staff take 3d images of my patients.  We also discussed using the images for an industry-wide trade conference.

4. I ultimately agreed to this agreement, and Mr. Sinclair and Mr. Read traveled to my office during Fall

6

## II. Standard of Review

A motion to dismiss for lack of personal jurisdiction "should be denied if plaintiff alleges sufficient facts to support a reasonable inference that defendant can be subjected to jurisdiction of the court." Jackam v. Hospital Corporation of America Mideast, 800 F.2d 1577, 1579 (11th Cir. 1986). On a motion to dismiss for lack of personal jurisdiction, the court must take the plaintiff's allegations as true to the extent they are uncontradicted, and if they are contradicted the court must construe all reasonable inferences in the plaintiff's favor. Madara v. Hall, 916 F.2d 1510, 1514 (11th Cir. 1990). However, the party

---

2004 and thereafter installed the camera.

5. During the installation, Mr. Sinclair and Mr. Read instructed Mr. Lester Robertson with respect to taking, downloading and ultimately printing images from the camera.

6. During the period that the camera sat in my offices, Mr. Rollin Read contacted me via email to inquire into the possibility of upgrading our software and using his camera more widely in my practice. I have attached a true copy of this email as Exhibit A.

7. We did take several photographs with the camera.

8. On or about November 15, 2005, Mr. Robertson told me that he had been contacted by Mr. Read, who wanted to come to my offices and collect the camera. Mr. Robertson asked me if this was a suitable arrangement (confirm this fact) and I agreed. Thereafter, on November 30, 2005, Mr. Read came and collected the camera.

An examination of the record reveals that Read is a representative of Canfield.

invoking federal court jurisdiction over a non-resident defendant bears the burden of establishing the court's jurisdiction. <u>Payne v. Kristofferson</u>, 631 F.Supp. 39, 41 (N.D. Ga. 1985).

### III. Legal Analysis

There are two types of personal jurisdiction, general and specific. "General personal jurisdiction arises from a party's contacts to the forum state that are unrelated to the litigation; the test for general jurisdiction is whether the party had 'continuous and systematic' general business contacts with the forum state." <u>Delong Equipment Co., v. Washington Mills Abrasive Co.</u>, 840 F.2d 843, 853 (11th Cir. 1988).  With regard to specific jurisdiction, the nature of the defendant's contacts with the state are such that it may be held liable only for causes of action stemming from a particular activity. <u>Id</u>.  The cause of action must arise directly out of or be directly related to a defendant's contacts with the forum. <u>Helicopteros Nacionales de Colombia, S.A. v. Hall</u>, 466 U.S. 408, 414, n. 8 (1984).

While the parties spent a great deal of time and effort briefing the issue of whether a Georgia court has general jurisdiction over either Surfim or SIIL, it is clear from the record that a Georgia court does not have general jurisdiction over either Surfim or SIIL.  Neither Surfim nor SIIL engaged in the type of "continuous and systematic" contacts in the state of Georgia necessary to find general jurisdiction.  Therefore, the court's

personal jurisdiction over Surfim and SIIL, if it exists at all, must be based on specific jurisdiction.

In order to determine whether the court has specific jurisdiction over either Surfim or SIIL, the court must examine Georgia's Long Arm Statute, O.C.G.A. § 9-10-91, which provides:

> A court of this state may exercise personal jurisdiction over any nonresident or his executor or administrator, as to a cause of action arising from any of the acts, omissions, ownership, use, or possession enumerated in this Code section, in the same manner as if he were a resident of the state, if in person or through an agent, he:
>
> (1) Transacts any business within this state;
>
> (2) Commits a tortious act or omission within this state, except as to a cause of action for defamation of character arising from the act;
>
> (3) Commits a tortious injury in this state caused by an act or omission outside this state if the tort-feasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state; or
>
> (4) Owns, uses, or possesses any real property situated within this state.

O.C.G.A § 9-10-91(1), which authorizes jurisdiction over a non-resident who "[t]ransacts any business within this state," applies only to claims based on contract, not those sounding in tort. Lutz v. Chrysler Corp., 691 F.2d 996, 997 (11th Cir. 1982). The plaintiffs' allegations of copyright infringement, federal unfair competition, and Georgia unfair competition are all grounded in tort law. Thus, in order for this court to have personal

jurisdiction over either Surfim and/or SIIL, the court must find that the plaintiffs' claims satisfy the requirements of either subsection (2) or (3) of O.C.G.A. § 9-10-91.

If the court determines that it has a jurisdictional basis pursuant to either O.C.G.A. § 9-10-91(2) or (3), the court must then engage in a second inquiry.  In the second inquiry, the court must determine whether the exercise of personal jurisdiction complies with federal due process. Lamb v. Turbine Designs, Inc., 207 F.3d 1259, 1260-61 (11th Cir. 2000).

### A. Are Surfim and SIIL
### a Single Corporate Entity?

As a preliminary matter, the court must determine whether Surfim and SIIL are the same company.  The plaintiffs argue that the two entities are so "inextricably intertwined that it is impossible for one to be a proper party to this litigation and for the other to be excluded."  In fact in their response, the plaintiffs refer to the two defendants as "Surfim and Medeim/SIIL".

In response, Surfim and SIIL argue that SIIL, Surfim, and Canfield are three separate corporate entities.  According to Surfim and SIIL, "SIIL was originally established to act as the exclusive sales and distribution entity for Surfim, Ltd., a U.K. company, to market 3-D imaging products and technology to healthcare industries."  According to SIIL and Surfim, SIIL is strictly a distributor of goods and does not manufacture any of the goods it sells, while Surfim was established to design and develop

a 3-D imaging system for use primarily in the healthcare industry. Surfim and SIIL also contend that "since Canfield acquired certain 3-D imaging technology, products and personnel of Surfim in December 2004, Surfim as a company has been effectively inactive." As part of the agreement between Surfim and Canfield, "several key Surfim personnel, including Otto, Athula Mandanayake, Gideon Amos, became employees of Canfield at its facility in Fairfield, New Jersey to further develop and market a 3-D imaging system under the Canfield name."[8]

Having reviewed the submissions of the parties, the court determines that Surfim and SIIL are two separate corporate entities for purposes of determining whether the court has personal jurisdiction over either one of them. In reaching this conclusion, the court placed significant weight on the fact that SIIL and Surfim have different addresses and different directors.[9]   The

---

[8] Considering these facts, the question of whether Surfim and SIIL are separate entities might be moot.  It is undisputed that Surfim has been inactive since it entered into the above described agreement with Canfield.  In ¶ 18 of the plaintiff's Second Amended Complaint, the plaintiff alleges, "From 2003 until 2005, Surfim and Medeim's or SII's commercial activities have been, on information and belief, somewhat limited."  Canfield, who appears to be the successor of Surfim, is already a party to this suit and has submitted to this court's jurisdiction by filing an answer to the complaint as well as a counterclaim.

[9] Even if the court were to assume without deciding that SIIL was a subsidiary of Surfim, the court would have reached the same conclusion because it is well-established that as long as a parent and a subsidiary are separate and distinct corporate entities, the presence of one in a forum may not be attributed to the other. Cannon Manufacturing Co. v. Cudahy Packing Co., 267 U.S. 333, 337

court also gave little weight to the exhibits produced by the plaintiffs to demonstrate that Surfim and SIIL were the same company.[10]

### B. Is 3QT's Copyright Infringement Action Proper in a United States District Court?

In both Surfim's and SIIL's motion to dismiss, they argue that 3QT's copyright infringement action against SIIL and Surfim is not

---

(1925).

[10] For support for the proposition that Surfim and SIIL should be treated as one company, the plaintiffs cite (1) a letter dated December 2, 2005, from Surfim's director Otto to 3dMD's director Land, where Otto appears to be speaking for both Surfim and SIIL; (2) the similarity of Surfim and SIIL's websites; and (3) alleged misappropriation and use of 3QT's business plan by 3D4M.

With regard to a letter from Otto to Land, it should be noted that this letter was marked "CONFIDENTIAL-FOR SETTLEMENT PURPOSES ONLY." This letter cannot be used as evidence pursuant to Federal Rule of Civil Procedure Rule 408. Even if the court were to examine the letter for the sole purpose of determining whether Surfim and SIIL are the same corporate entity, this letter does not, even if all reasonable inferences are drawn in the plaintiffs' favor, demonstrate that SIIL and Surfim are the same corporate entity.

With regard to the similarity of Surfim and SIIL websites, Surfim and SIIL argue that "they are clearly arranged to cross-reference between the manufacturer of the goods (Surfim) and the marketing and distributor for the goods (SIIL). This is commonplace in situations involving separate entities to manufacture and distribute goods." The court agrees; the similarity of the two companies' websites standing alone is insufficient to demonstrate that Surfim and SIIL are the same corporate entity.

With regard to the misappropriation of the business plan allegedly created for 3dMD, the court did not consider this evidence because the alleged misappropriation and use of 3dMD's business plan by 3D4M is not relevant for the purpose of determining whether Surfim and SIIL are the same corporate entity.

12

proper in a United States District Court in Georgia.  SIIL argues that it "did not commit an act of infringement by setting up the Canfield owned system at Paces Plastic.  SIIL did not write, copy, install and/or configure any software during the installation and training of the 3-D imaging system."  Surfim argues that it did not "commit any act of infringement in Georgia.  The source code at issue was developed and loaded onto a laptop computer in the U.K. prior to its sale by SIIL to Canfield."  Additionally, Surfim argues that all of its "corporate activities relating to the design, software coding and development of its 3D imaging system took place in England" and because 3QT (one of two plaintiffs in this action) is based in England, "any alleged copyright violation by Surfim should be pursued in the United Kingdom, not the District of Georgia."

Surfim and SIIL correctly note that many of the facts alleged in the plaintiffs' Second Amended Complaint occurred in the United Kingdom and outside this jurisdiction.    While the court is cognizant that federal copyright law has no extraterritorial effect and cannot be invoked to secure relief for acts of infringement occurring outside of the United States, at least one act of copyright infringement is alleged to have occurred in Georgia.  The plaintiffs have alleged that the act of copyright infringement occurred when either Surfim or SIIL installed a 3-D system at Paces Plastic in Atlanta, Georgia.  Therefore, the court must continue

its inquiry to determine whether the court has personal jurisdiction over either Surfim or SIIL for the actions or injuries that allegedly occurred in Georgia.

### C. Is Either Surfim or SIIL Subject to Personal Jurisdiction Under Georgia's Long Arm Statute

Recently, the Georgia Supreme Court in <u>Innovative Clinical & Consulting Services, LLC v. First Nat. Bank of Ames</u>, 279 Ga. 672, 674 (2005) clarified the considerable confusion over the interpretation of O.C.G.A. § 9-10-91(2) and (3) caused by <u>Shellenberger v. Tanner</u>, 138 Ga. App. 399 (1976) and its progeny. According to <u>Innovative Clinical & Consulting Services</u>:

> [U]nder subsection (2) a Georgia court may exercise personal jurisdiction over a nonresident who commits a tortious act or omission within this State, insofar as the exercise of that personal jurisdiction comports with constitutional due process; and under subsection (3) a Georgia court may exercise personal jurisdiction over a nonresident who commits a tortious injury in Georgia caused by an act or omission outside Georgia only if the tortfeasor "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state," notwithstanding that these limiting conditions may preclude a Georgia court from exercising personal jurisdiction over the nonresident to the fullest extent permitted by constitutional due process.(footnotes and internal citations omitted)

The plaintiffs argue that "it is irrefutable that a Surfim/SIIL 3D imaging system was delivered by SIIL Director Sinclair to Paces Plastic in Atlanta in the fall of 2004, well before Canfield acquired Surfim/SIIL assets." The plaintiffs argue

that Sinclair "was acting as an agent for commercial services on the Surfim/SIIL 3D imaging systems being placed, including the one in Georgia."[11]

In response, Surfim and SIIL acknowledge that the setup in Paces Plastic occurred prior to Canfield's acquisition of Surfim. Surfim and SIIL argue "Canfield purchased several systems through SIIL to deliver to medical facilities in the United States." They further contend that SIIL's activities in this forum consisted only of setting up the system and training the personnel at Paces Plastic on the use of the 3-D imaging system under a contract with Canfield.[12]

Surfim argues "[T]he manufacture of the 3-D imaging system in the U.K. did not involve any contacts with Georgia.  No one from

_____

[11] On this point, the plaintiffs continue:

According to Dr. Otto's declaration, Canfield later purchased rights to Surfim technology and equipment in December 2004.  Because it was installed well before then, the Paces Plastic machine was clearly developed by Surfim and was marketed/installed by SIIL.  The later change in ownership does not undo the actions that properly subject Surfim and SIIL to this Court's jurisdiction.

[12] Moreover on this point, Surfim and SIIL argue:

Plaintiffs correctly note that the Canfield owned system was manufactured by Surfim, and installed on behalf of Canfield by SIIL.  Plaintiffs fail to acknowledge that Surfim's manufacture of the 3-D imaging system occurred solely in the U.K. and that SIIL sold the system to New Jersey based Canfield.  Thus, no actions of SIIL, other than setting up the system on behalf of Canfield, took place in Georgia.

Surfim was involved in the set up and instruction of use at Pace Plastics."   Considering these facts, the court must now apply O.C.G.A. § 9-10-91(2) and (3) to Surfim and SIIL.

### 1. Long Arm Analysis
### With Regard to Surfim

With regard to O.C.G.A. § 9-10-91(2), Surfim argues that it did not perform any tortious act in Georgia because "all of Surfim's corporate activities relating to the design, software coding and development of its 3D imaging system took place in England." With regard to O.C.G.A. § 9-10-91(3), Surfim argues that this section of the Georgia Long Arm Statute does not establish personal jurisdiction. Specifically, Surfim argues that even assuming that a tortious injury occurred in Georgia from an act of Surfim committed outside the jurisdiction, i.e., the copyright infringement, it is not subject to the personal jurisdiction of a Georgia court because it does not regularly do or solicit business, or engage in any other persistent course of conduct, or derive substantial revenue from goods used or consumed or services rendered in Georgia.   On both of these points, the court agrees. From the facts in the record, the court is unable to reach the conclusion that Surfim either committed a tort in Georgia pursuant to 9-10-91(2) or that Surfim's activities outside the jurisdiction subjected it to the court's personal jurisdiction pursuant to 9-10-91(3).

In reaching the conclusion that 9-10-91(3) does not confer

jurisdiction, the court was unable to find from the record before it that Surfim regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in Georgia as is required by O.C.G.A. § 9-10-91(3).  Therefore, neither O.C.G.A. § 9-10-91(2) or(3) provides a jurisdictional basis for the court's exercise of personal jurisdiction over Surfim.  Therefore, Surfim's motion to dismiss based on lack of personal jurisdiction is GRANTED.[13]

## 2. Long-Arm Analysis
## With Regard to SIIL

Next, the court must determine whether either O.C.G.A. § 9-10-91(2) or (3) is applicable to SIIL.  In its motion to dismiss, SIIL argues:

> SIIL has not committed any acts of copyright infringement and/or engaged in unfair competition based upon copyright infringement.  SIIL did not write, install and/or configure any software which is the subject of Plaintiffs' claims.  Plaintiffs have not asserted any facts that would indicate any conduct by SIIL in Georgia that would give rise to any claimed injury.

Citing to Gee v. Reingold, 259 Ga. App. 894, 897 (2003), SIIL argues, "A tort, for purposes of long-arm jurisdiction, 'occurs when and where the actual injury or accident takes place, and not the place of the economic consequences of that injury.'"

---

[13] While the court does not have personal jurisdiction over Surfim, the facts in the record suggest that either New Jersey or the United Kingdom would have personal jurisdiction over Surfim.

The court interprets ¶¶ 17-20 of the plaintiffs' Second Amended Complaint to allege either direct, contributory, or vicarious copyright infringement. According to the recent United States Supreme Court decision of <u>Metro-Goldwyn-Mayer Studios, Inc., v. Grokster, Ltd.</u>, 125 S. Ct. 2764, 2776 (2005), "[o]ne infringes contributorily by intentionally inducing or encouraging direct infringement and infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it." (citations omitted).

The Court in <u>Metro-Goldwyn-Mayer Studios</u> continued that although "[t]he Copyright Act does not expressly render anyone liable for infringement committed by another," <u>Sony Corp v. Universal City Studios</u>, 464 U.S., at 434, 104 S. Ct. 774, these doctrines of secondary liability emerged from common law principles and are well established in the law, <u>id</u>. at 486, 104 S. Ct. 774 (Blackmum, J., dissenting) <u>Id</u>.

While it is beyond the scope of this court's inquiry at this stage in the litigation to examine the merits of the plaintiffs' allegations contained in ¶¶ 17-20 and Count I of the plaintiffs' Second Amended Complaint, the court finds that the plaintiffs have alleged that SIIL engaged in possible copyright infringement of some variety when Sinclair or a representative of SIIL installed a Canfield-owned and Surfim-manufactured 3-D imaging system which allegedly contained and was manufactured with copyrighted

18

information obtained from either 3dMD or 3QT at the offices of Paces Plastic in Atlanta, Georgia.

In his affidavit, Sinclair acknowledges that a SIIL representative traveled to Georgia for two days to install and train the personnel at Paces Plastic in the use of the 3-D imaging system. Moreover, Sinclair acknowledges that SIIL received a fee for installing the 3-D imaging system in Paces Plastics.[14]

---

[14] In an affidavit, SIIL's director Sinclair states:

19. SIIL's only contact with the State of Georgia was limited to setting up and providing training on the use of a single Canfield owned 3D imaging system. Specifically, as part of a clinical study which was conducted at medical facilities in three U.S. cities, SIIL was engaged by Canfield to set up a single 3D imaging system at medical facilities located in California, Texas and Georgia in the fall of 2004. The 3D imaging systems were not sold, but rather were loaned by Canfield to each of these medical facilities.

20. Setting up the systems in the locations identified in paragraph 19 above did not require anyone at SIIL to write, copy, install and/or configure any software. The system hardware included, among other components, a laptop computer. The 3D imaging software and other related programs required to operate the system were already installed on the laptop computer prior to being shipped to California, Texas and Georgia. Thus, SIIL's duties merely consisted of assembling the hardware components of the system and providing training on the use of the system.

21. A representative of SIIL was in Georgia for two(2) days to complete the installation and training of the system described in paragraphs 19 and 20 above. SIIL was paid for its travel and expenses as well as a fee of $1,200 USD per day for the single installation of hardware and training in Georgia. SIIL has had no further contacts with Georgia.

19

Moreover, the record indicates that Paces Plastics was approached by Sinclair regarding installing the 3-D imaging system at that location. The parties do not dispute that the 3-D imaging system that was installed in Paces Plastic was manufactured and built by Surfim. With regard to possible injury suffered in Georgia, the plaintiffs allege that they suffered damages as the result of the copyright infringement. Therefore, there is sufficient basis pursuant to O.C.G.A. § 9-10-91(2) for finding that the court has personal jurisdiction over the SIIL.

### D. Does the Exercise of Personal Jurisdiction Over SIIL Comply with Federal Constitutional Due Process

Determining whether the exercise of personal jurisdiction over a defendant complies with the federal constitutional due process is a two-step process. First, the court must determine whether the defendant established "minimum contacts" in the forum state, and, second, the court must determine whether the assertion of personal jurisdiction would comport with "traditional notions of fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).

### 1. Minimum Contacts

In order to establish that the exercise of specific jurisdiction over a nonresident defendant is appropriate, a plaintiff must demonstrate that a defendant's contacts with Georgia meet three criteria. First, the contacts must give rise to or be

related to the plaintiff's cause of action. <u>S.E.C. v. Carrillo</u>, 115 F.3d 1540, 1542 (11th Cir. 1997).  Next, the contacts must involve some act by which the defendant "purposefully availed" itself of the privilege of conducting activities within the forum, thus invoking the benefits and protections of forum law. <u>Id</u>.  Finally, "the contacts must be such that the defendant should reasonably anticipate being haled into court in the forum." <u>Id</u>.  That is, the nonresident defendant must "have fair warning that a particular activity may subject [it] to the jurisdiction of a foreign sovereign." <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 472 (1985).

In its motion to dismiss, SIIL argues that none of the three factors is applicable to the facts of this case.  The court disagrees.  With regard to whether Sinclair's contacts gave rise to or are related to at least one of the plaintiffs' causes of action, the record indicates that Sinclair, a representative and director of SIIL, traveled to Georgia[15] and a SIIL representative spent two

---

[15] The plaintiffs have produced an email from Sinclair to William Macy of Boeing.  Sinclair's email dated September 5, 2004, stated:

Dear William

Chris Cornish from Inition and I have been in communication re your interest in 3D digital surface imaging.  I am currently over here in the USA installing four of our FCS2 units in clinical centres in Newport Beach, Dallas, Atlanta and Sacramento.  I also expect that a fifth unit will be installed in NJ within the next few weeks and so the next question is how can we use

days setting up and training the personnel of Paces Plastic on the operation of a 3-D imaging system. This 3-D imaging system is alleged to have contained or was built using copyrighted material owned by either 3dMD and/or 3QT. Sinclair admits that he traveled to Atlanta, Georgia, and that a SIIL representative installed a 3-D imaging system at the Paces Plastic. Also, the record indicates that Sinclair or SIIL received payment for the installation and training services at the Paces Plastics location. Furthermore, Sinclair or a SIIL representative was reimbursed for his travel expenses while in Atlanta, Georgia. SIIL does not dispute that the 3-D imaging system was manufactured by Surfim and owned by Canfield. Therefore, Sinclair's contacts, i.e., either his or a representative of SIIL's installation of the allegedly infringing 3-D imaging system at Paces Plastics in Atlanta, Georgia, either gave rise to or was related to the plaintiffs' copyright

---

these locations to progress your project?

I'll be in Dallas tomorrow until late Wednesday evening. I then will be in Atlanta until Saturday morning when I travel to Sacramento. I will return to the UK on September 15th.

The plaintiffs also submitted a copy of Sinclair's hotel records. It appears that Sinclair was in the Atlanta area at least twice in 2004, once from October 21 to October 22, 2004, and on a second time from November 30, 2004, to December 1, 2004. While the above dates of Sinclair's visits to Atlanta, Georgia, do not correspond with the dates of his visits to Atlanta, Georgia, in the above email, Sinclair admits in his affidavit that a SIIL representative installed the 3-D imaging system in Atlanta, Georgia.

infringement claim contained in Count I of the plaintiffs' Second Amended Complaint.

With regard to whether Sinclair "purposefully availed" himself of the forum, the record reflects that Sinclair contacted Hester of Paces Plastics in Atlanta, Georgia, and engaged in a dialogue relating to installing a 3-D imaging system.   Subsequently, Sinclair came to Georgia and either he or a representative of SIIL installed the 3-D imaging system in September 2004.   Furthermore, the record indicates that Sinclair took several trips to Atlanta, Georgia in 2004.   The combined effect of these facts indicates that Sinclair "purposefully availed" himself of the forum.

With regard to whether Sinclair had fair warning that he could be subject to the courts of Georgia, the plaintiffs argue that Sinclair is a well-educated individual who has worked in the United States, is familiar with the laws and protections of both Georgia and the United States, and should have reasonably anticipated that his tortious business activities could have subjected SIIL to suit in Georgia.   The court agrees.   Therefore, SIIL has sufficient minimum contacts with Georgia.

## 2. Fairness Factors

Next, the court must examine whether the application of personal jurisdiction would comport with "traditional notions of fair play and substantial justice."  In doing so, the court must address a number of factors, including (1) the burden on the

defendant in defending the lawsuit; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of states in furthering fundamental substantive social policies. Robinson v. Giarmarco & Bill, P.C., 74 F.3d at 259; Burger King Corp., 471 U.S. at 477.

While the court must consider these factors,"[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." Cable/Home Communications Corp., 902 F.2d 829, 858 (11th Cir. 1990); Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 114 (1987). The United States Supreme Court has also indicated that when a defendant purposefully avails itself of a forum that a defendant can defeat jurisdiction only with a compelling argument that the fairness factors render jurisdiction unreasonable. Burger King, 471 U.S. at 477. In this case, SIIL has failed to make such a showing. SIIL has demonstrated no prejudice or added burden that the court's jurisdiction would impose on it.

The plaintiffs argue that the burden SIIL "faces from defending itself in this litigation is no more strenuous than attending to its business activities here in Georgia, or anywhere else in the United States." The court agrees. The record

indicates that Sinclair has made several trips to Georgia in the past. While slightly more unpleasant, the court can find no reason why attending a legal proceeding in Atlanta, Georgia, would be more burdensome than visiting Atlanta for a business meeting or traveling to Atlanta to install a 3-D imaging system. Also in the age of modern technology, with telephone conferences, electronic communications, etc., discovery matters and the eventual litigation of this suit in Georgia will not impose an undue burden on SIIL or Sinclair.

Additionally, the court finds that one of the plaintiffs in this suit, 3dMD, whose principal place of business is in Atlanta, Georgia, has a strong "interest in obtaining convenient and effective relief." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286., 292 (1980). Furthermore, Georgia has an independent and powerful interest in adjudicating a alleged copyright infringement dispute where at least one act of copyright infringement is alleged to have occurred in this forum. Moreover, Georgia has an interest in protecting the commercial activity within the state.

Therefore after evaluating the "fairness factors," the court concludes that the exercise of personal jurisdiction does not offend the "traditional notions of fair play and substantial justice." As the facts in the record indicate that the plaintiffs have satisfied both prongs of the test for determining whether the exercise of personal jurisdiction complies with federal due

process, SIIL's motion to dismiss for lack of personal jurisdiction is DENIED.

### E. Venue Analysis

Having already decided that it does not possess personal jurisdiction over Surfim, the court must determine only whether this court is a proper venue for the claims against SIIL.  On this point, SIIL argues, "Venue in this case is improper because no meaningful events with respect to SIIL relevant to the issues of copyright infringement" took place in Georgia.

The court finds no merit in SIIL's arguments regarding venue.[16]

---

[16] On the issue of venue, SIIL argues:

This Court does not have personal jurisdiction over SIIL and venue is also improper.  Furthermore, venue is not proper under 28 U.S.C. § 1391(b) because SIIL does not reside in this district and none of the alleged events giving rise to the claims asserted by Plaintiffs took place in this district.

However, the court finds that SIIL has misinterpreted 28 U.S.C. § 1391(b), because the subsections of 28 U.S.C. § 1391(b) are separated by an or and not an and.

28 U.S.C. § 1391(b) states:

(b) A civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (3) a judicial district in which any defendant may be found, if there is no district in which the action may otherwise be brought.(emphasis added)

26

As stated above, the court has already determined that events
giving rise to the plaintiffs' alleged copyright infringement claim
contained in Count I of the Second Amended Complaint occurred in
Georgia.   Therefore, venue in the Northern District of Georgia is
proper pursuant to 28 U.S.C. § 1391(b)(2).

**F. Personal Jurisdiction Over
Surfim Pursuant to Rule 4(k)(2)**

The plaintiffs argue,"[I]f this Court finds that the factual
evidence offered above is insufficient to establish specific
personal jurisdiction over Surfim/SIIL, then 3QT alternatively
requests that this Court find that Surfim/SIIL's activities with
the United States as a whole subject it to personal jurisdiction
under Federal Rule of Civil Procedure 4(k)(2)."[17]

Rule 4(k)(2) states:

If the exercise of jurisdiction is consistent with the
Constitution and laws of the United States, serving a
summons or filing a waiver of service is also effective,
with respect to claims arising under federal law, to
establish personal jurisdiction over the person of any
defendant who is not subject to the jurisdiction of the
courts of general jurisdiction of any state. (emphasis
added)

Rule 4(k)(2) permits the exercise of personal jurisdiction
over foreign defendants for claims arising under federal law when
the defendant has sufficient contacts with the nation as a whole

---

[17] Because the court has determined that it has specific
personal jurisdiction over SIIL pursuant to Georgia's Long Arm
Statute, the court need not reach the plaintiffs' Rule 4(k)(2)
argument with respect to SIIL and limits its analysis on this issue
solely to Surfim.

but is without sufficient contacts to satisfy the long-arm statute of any particular state. Carrillo, 115 F.3d at 1543-44.   In evaluating whether it should employ Rule 4(k)(2), a court looks to a defendant's contacts with the United States as a whole and whether any particular state has personal jurisdiction over the defendant. Id.

However, the court need not examine Surfim's contacts with the United States as a whole because Surfim has admitted that New Jersey has personal jurisdiction over it.   In its reply brief, Surfim states, "[S]everal directors of Surfim are now employees of Canfield and reside in New Jersey and that technology and products related to 3-D imaging systems were acquired by New Jersey based Canfield from Surfim, Surfim is subject to personal jurisdiction in New Jersey."[18]   Since Surfim concedes that the State of New Jersey has personal jurisdiction over it, the court finds that an application of Rule 4(k)(2) is inappropriate to the facts of this case.

---

[18]   The record suggests that New Jersey has personal jurisdiction over all three defendants in this suit.  Canfield has its principal place of business in New Jersey and SIIL also admits that New Jersey has personal jurisdiction over it.  Specifically, SIIL states, "Based upon its agreements and transactions with New Jersey based Canfield, SIIL would be subject to personal jurisdiction in New Jersey."

## IV. Conclusion

For the reasons stated above, SIIL's motions to dismiss for lack of personal jurisdiction and improper venue [Doc. Nos. 27 and 48] are DENIED; Surfim's motions to dismiss for lack of personal jurisdiction and improper venue [Doc. Nos. 13 and 47] are GRANTED; and SIIL's motion to dismiss for proper service [Doc. No. 14] is DISMISSED as moot.

SO ORDERED, this _16th_ day of May, 2006.

ROBERT L. VINING, JR.
Senior United States District Judge

29